**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**PARKERSBURG**

**WESLEY EDWARD McINTYRE,**

   **Plaintiff,**

v.            **CASE NO. 6:11-cv-00800**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

   **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

  This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

  Plaintiff, Wesley Edward McIntyre (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on June 4, 2009, alleging disability as of June 4, 2009, due to neuropathy in both feet, diabetes, and depression.  (Tr. at 10, 126-32, 133-37, 160-66, 197-202, 207-12.)  The claims were denied initially and upon reconsideration.  (Tr. at 10, 59-63, 64-68, 73-75, 76-78.)  On December 17, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 79-80.)  The video hearing was held on January 3, 2011 before the Honorable Harry C. Taylor, II.  (Tr. at 28-54, 89, 96.)  By

decision dated February 1, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-23.) The ALJ's decision became the final decision of the Commissioner on August 29, 2011, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On October 27, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts

to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).   The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 12.)   Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of obesity, hyperlipidemia, diabetes mellitus, neuropathy, and hypertension. (Tr. at 12-16.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 16-17.)  The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations.  (Tr. at 17-21.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 21.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as inspector, assembler, and office clerk which exist in significant numbers in the national economy.  (Tr. at 22.)  On this basis, benefits were denied.  (Tr. at 22-23.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to
> support a particular conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less than a
> preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368

F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged

with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.

1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot

escape their duty to scrutinize the record as a whole to determine whether the conclusions

reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported

by substantial evidence.

Claimant's Background

Claimant was 42 years old at the time of the administrative hearing.  (Tr. at 32.)  He

is a high school graduate.  (Tr. at 33-34.)  In the past, he worked as a gas station mechanic

and a mixer operator in a chemical plant.  (Tr. at 34, 46-47.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of

record, and will summarize it below.

Physical Health Evidence

Records indicate Claimant was treated on 16 occasions at the Minnie Hamilton

Health Care Center [MHHCC] from April 23, 2008 to October 21, 2010.  (Tr. at 263-311,

327-87.)  Claimant's "Problem List" for the time period is stated as morbid obesity,

migraines, hyperlipidemia, diabetes mellitus, hypertension, depressive disorder, and neuropathy.  (Tr. at 263.)

On June 26, 2008, Urlin Matthews, PA-C, MHHCC, noted Claimant's weight to be 361.80 pounds, and he had neuropathy, uncontrolled hypertension, obesity, depression, and hyperlipidemia.  Claimant was prescribed Glucophage, Trazadone, and Benicar.  A note states: "d/w [discussed with] pt to get inline c [concerning] wt [weight] reduction and sugar level and could reverse the neuropathy that is starting to settle in."  (Tr. at 266-67.)

On December 18, 2008, Michelle Taylor, PA-C [Physician's Assistant - Certified], MHHCC, stated:

> Weight 369.20 pounds...Pt [patient] states he is here for checkup on HTN and DM2...States feet and legs are tingling.  States he does not watch his diet.  Denies vision changes.  Denies chest pain.  States SOB [shortness of breath] "due to being fat,"  no more than normal...
>
> Less enjoyment from usual activities Yes.  Disappointment with self Yes.  Hopelessness Yes.  Irritability Yes.  Difficulty sleeping Yes...
>
> Discussed extensively with pt diet and exercise and his part in his Diabetes treatment.

(Tr. at 270-71.)

On January 29, 2009, Autumn Whitlock-Morales, M.D., MHHCC, stated that Claimant agreed to try to obtain his ideal body weight and to lose a set amount of pounds by his next office visit.  (Tr. at 276.)  His weight on that date was 366 pounds.  Id.  She stated that she "strongly encourage strict adherence to diet and start exercising, discussed at great length the potential complication of uncontrolled blood sugars.  He was also advised to have his diabetic eye exam."  (Tr. at 278.)

On April 28, 2009, Dr. Whitlock-Morales noted Claimant's weight to be 372 pounds

and stated:

> Pt here for f/u [follow-up] on chronic problems.  He has noticed worsening
> of leg/foot pain.  It seems to be progressing quickly and how has symptoms
> to mid shin.  He is having so much pain he is unable to work his customary
> job.  He also reports feeling depressed.  His family has noticed personality
> change and he feels "down in the dumps" all of the time.  He describes
> anhedonia.  He denies suicidal ideation.

(Tr. at 279.)

On June 3, 2009, Dr. Whitlock-Morales noted Claimant's weight to be 360 pounds:
"Pt presents for continued feet and leg pain.  He is not doing well with Ultram.  He is also
concerned about Cymbalta as it is not available in MAP [Medical Assistance Program].  He
and his wife feel he is depressed and ask to try something else.  He has also decided to
proceed with applying for disability."  (Tr. at 282, 362.)

On July 3, 2009, Dr. Whitlock-Morales noted Claimant's weight to be 359.4 pounds:
"He is still having severe pain and it is keeping him awake at night.  He is hopeful to try
something new."  (Tr. at 301, 359.)

On July 11, 2009, a State agency medical source completed a Physical Residual
Functional Capacity Assessment [PRFCA].  (Tr. at 230-38.)  The evaluator, Cindy
Osbourne, D.O., stated that Claimant's primary diagnosis is "DM [Diabetes Mellitus] with
LE [Lower Extremity] neuropathy" and his secondary diagnosis is "morbid obesity."  (Tr.
at 230.)  Dr. Osbourne found Claimant could perform light work with a "limit walk/stand
to 2 hours in an 8-hour workday due to pain and numbness as well as obesity.  Limit use
of LE's for foot controls for same."  (Tr. at 231.)  She marked that Claimant could perform
all postural limitations occasionally save for climbing ladder/rope/scaffolds, which could
never be performed.  (Tr. at 232.)  She concluded that Claimant had no manipulative, visual

or communicative limitations.  (Tr. at 233-34.)  Regarding environmental limitations, Claimant was unlimited with wetness, humidity and noise, and should avoid concentrated exposure to extreme cold or heat, fumes, odors, dusts, gases, poor ventilation, etc.  (Tr. at 234.)  Claimant was to avoid even moderate exposure to vibration and hazards.  Id. Dr. Osbourne concluded: "Complaints are credible and findings support decrease in RFC [Residual Functional Capacity] to light with 2 hours walk/stand limitations (sedentary) and other limits as indicated."  (Tr. at 237.)

On October 6, 2009, Dr. Whitlock-Morales noted: "Weight 335.20 pounds...He cont [continues] to c/o [complain of] foot pain.  He also reports that his heels are cracking and bleeding...He does not check his BS [blood sugar] as he should, though he has gotten better recently as his attorney suggested that he should for his disability hearings...weight loss 24 pounds." (Tr. at 298-99, 356-57.)

On October 16, 2009, Nikola Bicak, D.P.M. [Doctor of Podiatric Medicine], Jackson Foot and Ankle, treated Claimant upon referral from MHHCC for "Diabetic foot care/evaluation."  (Tr. at 323.)  Dr. Bicak stated:

> Patient appears well developed, well nourished, morbid obesity, in no distress.  Pt [patient] presents ambulating in normal angle and base of gait, w/NL [within normal limits] street shoes, in no apparent distress.  Examination of toe 1L, plantar aspect of heel L, plantar aspect of heel R demonstrates moderate, severe Hyperkerototic tissue, fissure. DP pulses are palpable, bilateral.  PT pulses are palpable, bilateral.  Capillary Fill Time (CTF) is 3 seconds 1-5, bilateral.  No edema observed.  Varicosities are not observed.  Skin temperature of lower extremities is warm to cool, proximal to distal.  Both feet demonstrates light touch sensation, absent, show signs of diminished protective sensations.  Deep tendon reflexes normal.  Muscle strength is 5/5 for all groups tested.  Muscle tone is normal.  Inspection and palpation of bones, joints, and muscles is unremarkable.
>
> Impression: Corns and callouses.  Diabetes mellitus, Type II w/ Neurologic Manifestations (LOPS) - Not stated as Uncontrolled.  Fissure.  Xerosis.  B/L.

> Plan: Lesion shows evidence of inflammation, is located in an area subject to repeat trauma and causes pain due to pressure, thus surgical debridement of hyperkerototic tissue was performed with a #15 blade, tissue nippers & diamond burr.

Id.

On November 17, 2009, a State agency medical source completed a Physical Residual Functional Capacity Assessment. (Tr. at 314-22.) The evaluator, Porfirio Pascasio, M.D. stated that Claimant's primary diagnosis is "DM with LE neuropathy" and his secondary diagnosis is "morbid obesity." (Tr. at 314.) Dr. Pascasio found Claimant could perform light work, stating "may walk and/or stand 2 hrs. in an 8 hr. workday. Limit on LE foot control. Both due to neuropathy and morbid obesity." (Tr. at 315.) He marked that Claimant could perform all postural limitations occasionally save for climbing ladder/rope/scaffolds, which could never be performed. (Tr. at 316.) He concluded that Claimant had no manipulative, visual or communicative limitations. (Tr. at 317-18.) Regarding environmental limitations, Claimant was unlimited with extreme heat, wetness, humidity and noise, and should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, poor ventilation, etc., and hazards. (Tr. at 318.)  Dr. Pascasio concluded: "I agree with prior evaluation that cmt [claimant] is credible. RFC remains sedentary." (Tr. at 319.)

On November 24, 2009, Dr. Whitlock-Morales noted: "Weight 337.0 lbs...Pt presents for his chronic problems. He continues to c/o leg pain. He is not taking meds as prescribed and he cannot relay what he is actually taking." (Tr. at 350.)

On January 25, 2010, Dr. Bicak treated Claimant stating that Claimant had returned for a follow-up exam:

> Pt presents ambulating in normal angle and base of gait, w/NL [normal] street shoes, in no apparent distress.  DP pulses palpable, PT pulses

palpable...Inspection and palpation of bones, joints, and muscles reveals no crepitation, pain or weakness, Xerosis B/L calc with fissures, no signs of infection noted.

Impression: Ulceration of lower limb which is non-decubitus in nature. Clinically, the condition has worsened, Xerosis, Niddm with Neuro.

Plan: The plan is unchanged from last treatment.  Debride all Hyperkerototic tissue...Fissure/ulcer was further cleansed...& covered...Patient was instructed to qd [*quaque die*, daily] bag balm and plastic bags and socks in the pm, keep wound dry & clean.  Pt instructed on signs of infection (increased redness, or drainage, odor, streaking, etc.) & instructed to inform office or to come in at once if any of these changes are noticed.  RA will give gt callous scraper for pt to be able to self reduce between visits if need.

(Tr. at 324.)

On February 1, 2010, Dr. Bicak treated Claimant stating that Claimant had returned for a follow-up exam: "Pt states the LEFT calc developed a new fissure last night and it bled last night and is sore...Impression:  Ulceration of lower limb which is non-decubitus in nature.  Clinically, the condition has worsened, Xerosis, Niddm with Neuro.  Plan: The plan is unchanged from last treatment."  (Tr. at 325.)

On February 8, 2010, Claimant was treated at Camden-Clark Memorial Hospital Emergency Department for complaints of flu symptoms and discharged with prescriptions for cough suppression.  (Tr. at 388-93.)

On April 2, 2010, Claimant had a left knee MRI without contrast.  Rakesh Barak, M.D., radiologist, noted:

IMPRESSION:
1. Suggestion of complex tear at body and posterior horn of medial meniscus with subluxation of medial meniscus body medially due to moderate degenerative changes at medial joint compartment.  Diffuse articular cartilage thinning is noted in this region, more prominent at the mediolateral aspect of joint compartment.  Also associated diffuse thickening of medial collateral ligament, strain cannot be completely excluded.  4 mm small cystic lesion of posterior aspect of posterior horn of medial meniscus probably

> represent a synovial cyst extension.  However, small meniscal cyst due to meniscus tear cannot be completely excluded.  A small diffuse joint effusion without a popliteal cyst.

(Tr. at 396-97.)

On April 20, 2010, Dr. Whitlock-Morales noted: "Weight 363.60 lbs....He is not doing well.  He has gained a lot of weight and he is not following diet."  (Tr. at 347.)

On May 6, 2010, Dr. Whitlock-Morales noted: "Pt is here for pre op assessment for knee surgery.  He believes it is for ACL repair.  He denies any chest pain, SOB, dizziness.  His exercise capacity is limited by pain in feet and legs.  He can participate in his son's baseball practice with no significant problems." (Tr. at 344.)

On May 29, 2010, Claimant was treated at Camden-Clark Memorial Hospital Emergency Department for a chest pain.  (Tr. at 398-424.)  Bairava S. Kuppuswamy, M.D. admitted Claimant due to his risk factors:

> Assessment and Plan:
> 1. Chest pain with significant risk factors.  Will admit him to rule out acute coronary syndrome even though it appears atypical.  Will get a Cardiology evaluation with his risk factors.
> 2. Gastroesophageal reflux disease with his morbid obesity and NSAID intake...
> 3. Diabetes on treatment.  Will continue the same.
> 4. Neuropathy currently on Neurontin.
> 5. Hypertension and hyperlipidemia on treatment.  Will continue the same.  Will closely monitor.
>
> The patient seems to have significant symptoms associated with obstructive sleep apnea.  Will schedule him for a sleep study as outpatient.

(Tr. at 419.)

On May 29, 2010, Dr. Barak stated the results of Claimant's portable AP view of the chest: "Findings/Impression: Poor inspiratory effort.  Mild platelike atelectatic changes at left midlung.  No evidence of definite focal pulmonary infiltrates or effusions.  No cardiac

failure, no pneumothorax.  Heart size is upper normal limits." (Tr. at 423.)

On May 30, 2010, Dr. Barak stated the results of Claimant's PA and lateral views of the chest: "Findings/Impression: Compared to previous chest x-ray examination of 05/29/2010, no significant change.  Left mid lung platelike atalectatic change.  Poor inspiratory effort is noted.  No definite dense consolidation, significant pleural effusions or pneumothorax.  Heart size is within normal limits.  No evidence of overt cardiac failure." (Tr. at 424.)

On June 10, 2010, Claimant had a left knee surgery at Camden-Clark Memorial Hospital. (Tr. at 415-31.)  The "left knee arthroscopic partial medial meniscectomy and chondroplasty of the medial femoral condyle and patella" was performed by Earl F. Braunlich, M.D.  He stated: "No complications...He can be full weight bearing.  Will begin physical therapy rehab protocol.  He will follow up in the orthopaedic clinic in two weeks for suture removal." (Tr. at 431.)

On August 10, 2010, Dr. Morales, formerly Dr. Whitlock-Morales,  stated that the reason for Claimant's visit was "obesity, hyperlipidemia, hypertension, diabetes and neuropathy." (Tr. at 337.)  She described Claimant's obesity as "severe...The patient is gaining weight...Aggravating factors include high fat diet, lack of exercise and poor mobility." Id.  She described Claimant's hyperlipidemia as a "moderate" problem: "Patient compliance with medication is excellent...Patient is not compliant with diet and exercise." Id.  Regarding Claimant's diabetes, Dr. Morales stated: "The problem is stable.  He has been managed with oral medications.  He is experiencing chest pain.  Patient is compliant with medication, follow-up.  Patient did not use educational materials." Id.  Regarding neuropathy, Dr. Morales stated: "Severity level is severe.  Location of pain is foot bilateral.

The problem occurs constantly.  Gait is characterized as shuffling...Symptom is aggravated by movement, standing and use.  There are no relieving factors." Id.

On August 10, 2010, Dr. Morales partially completed a form from the West Virginia Department of Health and Human Resources Medical Review Team (MRT).  (Tr. at 326.) Dr. Morales stated that Claimant's diagnosis was "DM, HTN [hypertension], Hyperlipidemia, Neuropathy" and that his "Incapacity/Disability" is expected to last his "lifetime." Id.  She stated Claimant's employment limitations as: "cannot walk well, cannot sit/stand for prolonged period (30 min. max - but is in pain immediately." Id.  She marked that Claimant cannot participate in a classroom setting activity because he "cannot sit for extended periods." Id.

On August 16, 2010, Debbie Jones, Physical Therapist, MHHCC, noted that Claimant had a partial meniscectomy at Camden Clark Hospital in June 2010 and that Claimant "reports he felt better - never returned to MD - took stitches out himself." (Tr. at 376.)  Ms. Jones stated that Claimant's chief complaint was "knee pain, tender at kneeling."  Id. Records indicate that Claimant reported for physical therapy on August 16, 2010, August 18, 2010, August 30, 2010, September 1, 2010, September 10, 2010, and September 13, 2010.  (Tr. at 381.)

On October 21, 2010, Dr. Morales noted: "Patient diagnosis is DIABETES MELLITUS WITHOUT MENTION OF COMPLICATION.  The weight is 380.0 lb....Patient diagnosis is benign essential hypertension... will cont weight checks, encourage cont low calorie and portion control, advised daily exercise.  Will refer elsewhere for bariatric surgery...advised to decrease salt intake." (Tr. at 329-30.)

On September 10, 2010, Dr. Morales stated that Claimant was being "seen for

diabetes education...strongly encouraged portion control with foods, daily exercise and wt [weight] loss...Pt agreed to exercise and eating healthier." (Tr. at 332.)

On September 10, 2010, Dr. Morales completed a "Physician's Summary" form for the West Virginia Department of Health and Human Resources Medical Review Team (MRT). (Tr. at 386.) Dr. Morales stated that Claimant's diagnosis was "DM w/ neuropathy, HTN, hyperlipidemia, depression, anxiety, obesity, severe foot pain" and that his "Incapacity/Disability" is expected to last his "lifetime." Id. She stated Claimant's employment limitations as: "Pt cannot stand, walk or sit for prolonged periods. He also has anxiety and depression which makes it difficult to work w/ people." Id. She marked that Claimant cannot participate in a classroom setting activity because he "cannot sit for extended periods." Id.

Mental Health Evidence

On July 16, 2009, a State agency medical source completed a adult mental status consultative evaluation report. (Tr. at 239-43.) The evaluator, Cynthia Spaulding, M. A., Licensed Psychologist, noted that Claimant "is not currently and has never received mental health treatment." (Tr. at 240.) She made the following observations:

> **Mental Status Examination**:
> **Appearance**: He was dressed casually and his hygiene was good.
> **Attitude/Behavior**: He cooperated with the evaluation.
> **Speech**: His speech was relevant and coherent and of normal tone and rhythm.
> **Orientation**: He was fully oriented to person, place, time and circumstance.
> **Mood**: Depressed based on the claimant displaying restricted affect, becoming tearful and self-reported symptoms.
> **Affect**: Restricted based on the claimant showing a reduction in his range of emotional expression.
> **Thought Content**: Mr. McIntyre has symptoms of obsessive-compulsive disorder. He describes that he showers between three and five times per day and washes his hands over 20 times per day for approximately 1 minute each

wash.  He also checks "everything" four times or more before going to sleep at night.

**Thought Process**: His stream of thought was within the normal limits.

**Perceptual**: Mr. McIntyre reports that he began hearing voices after his mother died.  He describes "it's like she is here" and he hears her voice telling him to take care of the kids.

**Insight**: Fair.

**Psychomotor Behavior**: Within normal limits based on observation during assessment.

**Judgment**: Moderately impaired based on the claimant obtaining a standard score of five on the Comprehension Subtest of the WAIS-IV.

**Suicidal/Homicidal Ideation**: During his first divorce he made a suicide attempt.  He currently has suicidal ideations but states he would not harm himself because he has a family.  He does not have a specific plan to harm himself but often wishes to be dead.

**Immediate Memory**: Within normal limits based on the claimant remembering four of four words immediately after they were given.

**Recent Memory**: After 10 minutes the claimant was unable to remember any of the four words indicating that his recent memory processes are severely deficient.

**Remote Memory**: Within normal limits as evidenced by the claimant's ability to recall details of his personal history without difficulty.

**Concentration**: Within normal limits based on the claimant obtaining a standard score of nine on the Digit Span subtest of the WAIS-IV.

**Persistence**: Within normal limits based on observation during assessment.

**Social Functioning During the Evaluation**: Mr. McIntyre made adequate and appropriately focused eye contact.  He cried throughout the assessment and was unable to engage in conversation or respond to humor.

**Social Functioning - Self Reported**: Although he has friends he reports that he has not had any social contact with them in recent past.  He does visit with his father, occasionally goes grocery shopping and attends his children's school activities.

**Daily Activities / Typical Day**: Describing a typical day, he states, "I sit around and don't do much of nothing."  He elaborates that he attempts to do housework and watches television.

**Diagnostic Impression**:

| | | |
|---|---|---|
| Axis I | 296.24 | Major Depression, single episode, with psychosis |
| | 300.00 | Obsessive Compulsive Disorder |
| Axis II | 799.9 | Deferred |
| Axis III | | See chief complaints |

14

**Diagnostic Rationale**: The diagnosis of major depression is given based on observing the claimant to have restricted affect, become tearful during assessment, his verbal interactions with this examiner and the self-reported symptoms of sleep disturbance, anhedonia, feeling worthless, hopeless and guilty.  He also has suicidal ideations but does not have a plan to harm himself.  Since the death of his mother, he has experienced auditory hallucinations that are congruent with his depression and worries about taking care of his children and family.  He is also being diagnosed with Obsessive Compulsive Disorder based on him being compelled to shower between 3 and 5 times per day.  He also washes his hands excessively and checks things over four times before going to sleep.

**Prognosis**: Guarded.

**Capability**: The claimant is capable of managing his funds should they be awarded to him.

(Tr. at 240-41.)

On August 19, 2009, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 244-57.)  The evaluator, Jim Capage, Ph.D., concluded that an Mental Residual Functional Capacity [MRFC] assessment was necessary to evaluate Claimant's affective ("MD [major depression], single episode per CE [clinical evaluation]") and anxiety-related disorders ("OCD per CE").  (Tr. at 244, 247, 249.)   Dr. Capage determined Claimant had a mild degree of limitation regarding restriction of activities of daily living, a moderate degree of limitation regarding difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration.  (Tr. at 254.) He determined that the evidence does not establish the presence of the "C" criteria.  (Tr. at 255.) Dr. Capage concluded:

Based on the Tx [treatment] source notes that indicate tx for Depressive Disorder, NOS [not otherwise specified], the clmt's [claimant's] presentation and statements concerning his sx's [symptoms] and limitations, made at the CE and on his FR [Function Report] - Adult, seem to have been a bit of an overstatement.  Nevertheless, credibility is deemed adequate.  Clmt's impairments are severe, but do not meet nor equal the Listings.  A MRFC

15

assessment is indicated.

(Tr. at 256.)

On August 19, 2009, Dr. Capage completed a MRFC Assessment form.  (Tr. at 258-62.) He marked that Claimant was not significantly limited in the following abilities: The ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to ask simple questions or request assistance; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; the ability to set realistic goals or make plans independently of others.  (Tr. at 258-59.)

Dr. Capage marked that Claimant was moderately limited in the following abilities: The ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers

16

or peers without distracting them or exhibiting behavior extremes; the ability to respond appropriately to changes in the work setting. Id.

Dr. Capage concluded: "Clmt's mental impairments impose no more than moderate limitations upon functioning as reflected by the ratings of Part I of this Form. It seems that he retains the mental-emotional capacity to perform routine work-related activities in a low-pressure setting that requires no more than occasional and superficial social interaction." (Tr. at 260.)

On November 5, 2009, a State agency medical source completed a case analysis. (Tr. at 312.) The evaluator, Joseph Kuzniar, Ed.D., Psychologist, stated: "I have reviewed the evidence in file and the decision of 8-19-09 is affirmed as written." Id.

Claimant's Challenges to the Commissioner's Decision

Claimant argues that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to give adequate weight to the treating physician, and (2) the ALJ did not properly assess the residual functional capacity [RFC], thus rendering the vocational expert's [VE] testimony unreliable. (Pl.'s Br. at 2-6.)

The Commissioner's Response

The Commissioner responds that (1) the ALJ followed controlling regulations in weighing the opinion evidence; and (2) the VE testified that other work existed for a person with Claimant's limitations. (Def.'s Br. at 9-19.)

Analysis

Treating Physician

Claimant argues that the ALJ failed to give adequate weight to the opinion of the treating physician, Dr. Morales. (Pl.'s Br. at 2-4.) Specifically, Claimant asserts:

17

On August 10, 2010, Dr. Morales, the claimant's primary care physician, completed an assessment for the WV Department of Health and Human Resources and opined that the claimant had the following employment limitations: cannot walk well, and cannot sit or stand for prolonged periods - 39 minutes maximum.  *See Ex.* 9F.  Dr. Morales completed another assessment for WVDHHR on September 10, 2010 and further opined that the claimant cannot stand, walk or sit for prolonged periods; and has difficulty working with people secondary to his anxiety and depression.  *See Ex.* 10F. The ALJ failed to adopt the limitations identified by Dr. Morales in assessing the RFC...

Dr. Morales's records reveal a diagnosis of high blood sugars and morbid obesity since 2008, at that time having a body mass index of 50.07.  *See Ex.* 5F.  Subsequent treatment records dated April 2009 note the claimant complaining of leg and foot pain.  *Id.*  At that time Dr. Morales documented an impression of diabetic neuropathy.  *Id.*  Consistent complaints of leg and foot pain continue throughout Dr. Morales's records, with evidence of decreased sensitivity in the feet bilaterally as well as soft nodules on the left shin.  *Id.*  In October 2009 Dr. Morales referred the claimant to a podiatrist for further treatment of his feet, where he reported painful hyperkeratotic lesions, which were worsened with wearing shoes or walking.  *See Ex.* 8F.  A visit with Dr. Morales in August 2010 documented the claimant's "history of present illness" to include obesity, noted as a severe problem as the claimant continues to gain weight, does not exercise, maintains a high fat diet, and reduces the claimant's mobility.  *See Ex.* 10F.  Dr. Morales also noted the claimant's neuropathy of the feet bilaterally is severe, and is aggravated by movement, standing, and use.  *Id.*  The claimant also complained of neuropathy in the hands and arms.  *Id.*

The ALJ did not give adequate reasons for rejecting Dr. Morales's opinion evidence.  The ALJ was obligated to evaluate and weigh medical opinions...However, here the ALJ simply gave the opinion "some weight," finding "no evidence to support the limitations with regard to sitting or due to mental impairments."  *See* ALJDEC at 11.  He failed to cite any such records that do not support Dr. Morales's opinion, and he failed to explain the vast relationship that existed between the claimant and Dr. Morales, having lasted for several years.

(Pl.'s Br. at 2-4.)

The Commissioner responds that the ALJ followed the controlling regulations in weighing the opinion evidence and not adopting the opinion of Dr. Morales.  (Def.'s Br. at 14.)  Specifically, the Commissioner argues:

Although Plaintiff disputes the ALJ's articulation in evaluating Dr. Morales' opinion (Pl.'s Br. at 3-4), the ALJ followed the Commissioner's rulings by stating the weight given to the opinions and the reasons for that weight.  See SSR 96-2p...

In accordance with the controlling regulations and rulings, the ALJ stated that he gave the opinion "some weight" (Tr. 20), and explained that there was "no evidence to support the limitations with regard to sitting or due to mental impairments" (Tr. 20-21)...The ALJ made this finding after reviewing the evidence, and noting: "medications were effective" in controlling symptoms from Plaintiff's mental impairments (Tr. 13-14); treatment notes do not document depression as a severe problem (Tr. 14) (first full paragraph); there was no mention of depression in treatment notes and "physical examination revealed the claimant was alert and oriented with 'no unusual anxiety or evidence of depression'" (Tr. 14) (second full paragraph); a consultative examination was essentially normal, aside from Plaintiff's subjective complaints (Tr. 14-15) (third, fourth, and fifth full paragraphs on page 14); Plaintiff required no treatment with a mental health specialist or psychiatric hospitalization (Tr. 14-15) (last paragraph on page 14, first paragraph on page 15); clinical findings and daily activities showed no severe mental impairment (Tr. 15) (third, fourth, and fifth full paragraphs); the treatment notes showed that Plaintiff was in "mild pain" (Tr. 18) (second full paragraph); Plaintiff "fail[ed] to comply with treatment recommendations and prescription medications," Plaintiff was out of medications and "failed to seek refills," Dr. Morales "noted his 'noncompliance,'" and "the claimant 'is not taking med[ications] as prescribed and he cannot relay what he is actually taking,' and that he "does not watch his diet" (Tr. 18-19) (third and fourth full paragraphs on page 18, third full paragraph on page 19); Plaintiff "does not check his blood sugar levels as he should, 'though he has gotten better recently as his attorney suggested that he should for his disability hearing'" (Tr. 19) (second full paragraph); Plaintiff had a "significant gap in treatment" (Tr. 19) (fourth full paragraph); Plaintiff's "deep tendon reflexes, muscle strength testing, and muscle tone were normal" (Tr. 19) (first paragraph); "inspections of the bones, joints, and muscles revealed no crepitation, pain, or weakness" (Tr. 19); the podiatrist "observed the claimant ambulated at a normal angle and base of gait and was in no apparent distress" (Tr. 18-19) (last paragraph on page 18, first full paragraph on page 19); "although the claimant complained of neuropathy in the hands and arms, the record failed to document any evidence of upper extremity neuropathy" (Tr. 20-21) (last full paragraph on page 20, first paragraph on page 21); and "the office notes indicated the claimant's hyperlipidemia was moderate and his diabetes and hypertension appear to be stable" (Tr. 20) (first paragraph).

Plaintiff also complains that the ALJ did not specifically state the length of Plaintiff's treatment with Dr. Morales (Pl.'s Br. at 4).   But the ALJ

> acknowledged that Dr. Morales was "the claimant's primary care physician" (Tr. 20), and described Plaintiff's treatment with Dr. Morales in detail, specifically discussing several visits (Tr. 18-20), thereby fully acknowledging that Dr. Morales had treated Plaintiff for a length of time. However, the ALJ is required to use no particular format in weighing the opinion evidence, and the ALJ the [sic] regulations are clear that an opinion from a treating physician that is unsupported by or inconsistent with the regulations will not be given controlling weight. See 20 C.F.R. § § 404.1527(e), 416.927(e). Indeed, the ALJ found that the opinion was entitled to "some weight" and found that Plaintiff was limited in standing (Tr. 14, 17). Moreover, with respect to the opinion regarding Plaintiff's ability to interact with others, unskilled work generally involves working primarily with things, rather than people (Tr. 22, 48). See 20 C.F.R. pt. 404, subpt. P, app. 2, § 201.00(h)(3)(I).

> Upon finding this opinion evidence not entitled to controlling weight, the ALJ was entitled to give greater weight to the opinions of state agency physicians Drs. Pascasio and Osbourne, and to base his decision on the entire record (Tr. 20, 230-37, 314-21).

(Def.'s Br. at 15-18.)

The ALJ made very thorough findings in his 14-page decision of February 1, 2011 regarding the medical evidence of record, including extensive findings regarding the opinions of the treating physician, Dr. Morales:

> The undersigned notes the record reveals the claimant sought treatment from general practitioner Autumn Whitlock-Morales, M.D. Dr. Morales consistently treated the claimant for obesity, hyperlipidemia, diabetes mellitus, neuropathy, and hypertension (Exhibits 5F and 10F). These impairments are established by the medical evidence and are "severe" within the meaning of the Regulations because they significantly limit the claimant's ability to perform basic work activities.

> The record also reveals a history of depressive disorder, obsessive compulsive disorder, status post arthroscopic knee surgery, migraines, edema, respiratory infection, flu, atypical chest pain, and cough/flu-like symptoms (Exhibits 2F, 5F, 10F, and 11F). However, the undersigned finds these medically determinable conditions do not more than minimally impact the claimant's ability to perform work-like activities, and therefore are not severe...

> The undersigned notes a thorough review of the record reveals the claimant did not report new complaints of knee pain and swelling to his general

practitioner Dr. Morales...the undersigned finds this is not a severe impairment.

The undersigned notes a thorough review of the record also reveals few references to migraine headaches. In fact, the office treatment notes from Dr. Morales dated 2010 only list migraines as a problem (Exhibit 10F). The record however, fails to document any treatment for migraine headaches, nor does the claimant allege any limitations due to migraine headaches, thus they are considered non-severe.

Further, the undersigned notes Dr. Morales documented an impression of edema in October of 2010, after a weight gain. The claimant was advised to decrease his salt intake at that time (Exhibit 10F). The undersigned notes, however, the record fails to document any additional treatment for edema, nor does the claimant allege any limitations due to this impairment. The record also documented evidence of an upper respiratory infection, flu, atypical chest pain, and cough and flu-like symptoms, which were acute and episodic events (Exhibits 5F, 10F, and 11F).

With regard to mental impairments, the record reveals the claimant received treatment for depressive disorder from general practitioners at the Minnie Hamilton Health Care Center [MHHCC]. The record first documented the claimant's reports of depression in June of 2008. At that time, the claimant was placed on Trazodone. The undersigned notes a subsequent treatment record dated December of 2008, documented the claimant presented with a "normal mood," "pleasant affect," and was oriented (Exhibit 5F). Further, a treatment record from MHHCC dated January of 2009, noted the claimant "denies anxiety, depression, agitation, and restlessness" (Exhibit 5F). As such, the undersigned notes the record documented the claimant was prescribed and had taken appropriate medications for the alleged impairments, and that the medications were effective in controlling the claimant's symptoms.

In April of 2009, however, the claimant once again reported feelings of depression. The undersigned notes, however, these depressive symptoms arose after the claimant ceased taking prescription medication (Trazodone), which was previously successful in controlling his depressive symptoms. The claimant was prescribed Cymbalta; however, the Cymbalta was unsuccessful in controlling the claimant's depressive symptoms. He was once again prescribed Trazodone in June of 2009 (Exhibit 5F).

The undersigned notes subsequent treatment records documented the claimant's reports of depression. However, the records also clearly documented the claimant's failure to comply with his treatment regime. Specifically, Dr. Morales noted in November 2009, the claimant was non-

compliant with treatment. In fact, she noted the claimant "is not taking meds as prescribed and he cannot relay what he is actually taking" (Exhibit 10F).

Further, the undersigned notes Dr. Morales failed to document depression as a severe problem in a detailed office visit record dated August 10, 2010....Moreover, physical examination revealed the claimant was alert and oriented with "no unusual anxiety or evidence of depression" (Exhibit 10F).

The record also includes a consultative examination report completed by Cynthia Spaulding, M.A. and dated July 16, 2009...Ms. Spaulding observed during the interview the claimant presented with a depressed mood and became tearful during his self-reported symptoms. However, the claimant was cooperative, oriented, and his speech was relevant, coherent, and with a normal tone and rhythm. Moreover, the undersigned notes Ms. Spaulding documented an essentially normal mental status examination...the undersigned notes Ms. Spaulding documented no deficiencies in social functioning, persistence, concentration, or memory and noted these functions are "within normal limits based on observations" during the assessment. Further, she documented no evidence the claimant was treated by a specialist, such as a psychiatrist or psychologist, participated in counseling or psychotherapy, or was hospitalized for psychological purposes.

Further, the undersigned notes the claimant's medically determinable mental impairments of depression and obsessive compulsive disorder, considered singly or in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere...Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been for extended duration in the fourth area, they are nonsevere (20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1))...

In January of 2009, the claimant was treated by Autumn Whitlock-Morales, M.D. Dr. Morales directed the claimant to lose weight and adhere to a diet and exercise. She noted, "discussed at great length the potential complication of uncontrolled blood sugars." Further, the records noted the claimant's last AIC score was "7.0" (Exhibit 5F). Subsequent treatment records dated April of 2009, noted the claimant reports of leg/foot pain. At that time, Dr. Morales documented an impression of diabetic neuropathy, and further noted the claimant had better control of blood sugar, but still maintained a poor diet (Exhibit 5F). In June of 2009, Dr. Morales continued to document the claimant's reports of leg and foot pain and observed evidence of decreased sensitivity in the feet bilaterally as well as soft nodules on the left shin. She documented an impression of diabetes without complication type 2 and neuropathy. Subsequent treatment record documented the claimant

was prescribed Lortab and Percocet for pain management. Also, in October, Dr. Morales noted the claimant's continued reports of problems with his feet and referred him to a podiatrist for further treatment of his feet (Exhibit 5F, repeated at 10F).

The record includes a treatment record from Nikola Bicak, D.P.M. with Jackson Foot and Ankle dated October 16, 2009...Dr. Bicak observed the claimant ambulated at a normal angle and base of gait and was in no apparent distress. A physical examination revealed evidence of hyperkeratotic lesions, but no evidence of edema or varicosities. The claimant's feet demonstrated the absence of light touch sensation and diminished protective sensations, but deep tendon reflexes, muscle strength testing, and muscle tone were normal...

Subsequent treatment records from Dr. Bicak, noted similar complaints of lower limb ulcers, yet physical examination revealed the claimant ambulated at a normal angle and gait, and was in "no apparent distress." Also, inspections of the bones, joints, and muscles revealed no crepitation, pain, or weakness...(Exhibit 8F).

The undersigned notes treatment records dated October of 2009 from the MHHCC continued to document the claimant's failure to comply with medical directives. In fact, Dr. Morales documented the claimant, on his own accord, stopped his Glipizide medication after documenting a few low blood sugar readings. She indicated the claimant does not check his blood sugar levels as he should, "though he has gotten better recently as his attorney suggested that he should for his disability hearing." The undersigned further notes the record includes an AIC level of 6.1 on October 6, 2009, which indicates the claimant diabetes is controlled (Exhibit 5F, repeated at 10F).

Similarly, treatment records from Dr. Morales dated November of 2009 documented the claimant's failure to comply with medical directives. The claimant once again sought treatment with Dr. Morales for complaints of chronic pain. However, Dr. Morales documented the claimant as non-compliant with treatment...and directed the claimant to bring in the medications he is taking and noted his "noncompliance" (Exhibit 10F).

The record reveals however, the claimant did not seek treatment with Dr. Morales until April of 2010, which represents a significant gap in treatment for an individual who was not taking his medication as prescribed. Dr. Morales noted the claimant is "not doing well" and had "gained a lot of weight and he is not following diet." At that time, a body mass index of 52.17 was documented and the claimant reported pain and tingling in his feet and legs...The claimant was advised to "get back on diet and exercise program" as "weight loss is crucial" (Exhibit 10F).

23

Further, the undersigned notes the record includes a detailed office visit record from Dr. Morales dated August 10, 2010. The office visit report documented the claimant's "history of present illness" included obesity, which is a severe problem as the claimant continues to gain weight, does not exercise, maintains a high fat diet, and reduces the claimant's mobility. Dr. Morales also noted the claimant's neuropathy of the feet bilaterally is severe, and is aggravated by movement, standing, and use. The undersigned notes although the claimant complained of neuropathy in the hands and arms, the record failed to document any evidence of upper extremity neuropathy. Moreover, the office notes indicated the claimant's hyperlipidemia is moderate and his diabetes and hypertension appear to be stable (Exhibit 10F).

In addition, the undersigned notes treatment record with Dr. Morales included complete blood count testing, which indicated the claimant's glucose level was at 140 in December of 2008, 126 in July of 2009, and 112 in August of 2010. While the undersigned notes these glucose levels signify diabetes mellitus, they are significantly lower than the 500 levels the claimant testified to at the hearing (Exhibit 10F).

As for the opinion evidence, the record includes a physical residual functional capacity assessment completed by Cindy Osborne, D.O. and dated July 11, 2009. Dr. Osborne noted the claimant can occasionally lift twenty pounds and frequently lift ten pounds. The claimant can stand/walk two hours in an eight-hour day, and sit six hours in an eight-hour day. In addition, the claimant is limited with regard to pushing or pulling with the lower extremities. The claimant can never climb ladders, ropes, or scaffolds, and can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. The claimant should avoid concentrated exposure to extreme cold and heat, fumes, odors, dusts, gases, and poor ventilation, and avoid even moderate exposure to vibrations and hazards, such as machinery or heights (Exhibit 1F). The undersigned gives Dr. Osborne's opinion significant weight, as it is consistent with the record as a whole.

Further, the record includes a physical residual functional capacity assessment completed by Porfirio Pascasio, M.D. dated November 17, 2009. Dr. Pascasio noted the claimant can occasionally lift twenty pounds and frequently lift 10 pounds. The claimant can stand/walk two hours in an eight-hour day, and sit six hours in an eight-hour day. In addition, the claimant is limited with regard to pushing or pulling with the lower extremities. The claimant can never climb ladders, ropes, or scaffolds, and can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. The claimant should avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, vibrations and hazards, such as machinery or heights (Exhibit 7F). The undersigned gives Dr. Pascasio's

24

opinion significant weight, as it is consistent with the record as a whole.

In addition, the record includes a form from the West Virginia Department of Health and Human Resources, which was completed by Dr. Morales, the claimant's primary car physician, and dated August 10, 2010. Dr. Morales indicated the claimant "cannot walk well" and "cannot sit/stand for prolonged period[s]" of time. She indicated the claimant is limited to walking or standing thirty minutes at a time. In addition, she stated the claimant cannot sit for extended periods of time in a classroom setting (Exhibit 9F). In addition, the record includes a physician summary form completed by Dr. Morales on September 10, 2010, which indicates the claimant cannot stand, walk, or sit for prolonged periods. Further, the claimant has anxiety and depression, which makes it difficult to work with people (Exhibit 10F). The undersigned gives Dr. Morales's opinions some weight. While the claimant [sic, undersigned] considered the evidence in the light most favorable to the claimant and limited him to less than sedentary exertional activities, the undersigned finds no evidence to support limitations with regard to sitting or due to mental impairments.

The record also includes a psychiatric review technique completed by Jim Capage, Ph.D., and dated August 19, 2009. Dr. Capage indicated the claimant is mildly limited with regard to activities of daily living, and moderately limited with regard to social functioning and maintain[ing] concentration, persistence, and pace (Exhibit 3F). In addition, Dr. Capage completed a mental residual functional capacity assessment and indicated the claimant retains the mental and emotional capacity to perform routine work-related activities in a low-pressure setting that requires no more than occasional and superficial social interaction (Exhibit 4F). The record also includes a medical case analysis completed by Joseph Kuzniar, Ed.D., dated November 5, 2009, which affirmed Dr. Capage's opinion dated August 19, 2009 (Exhibit 6F).

The undersigned gives Dr. Capage's and Dr. Kuzniar's opinions little weight in that the doctors' opinions are without substantial support from the other evidence of record, which obviously renders it less persuasive. The undersigned noes the record includes only one consultative evaluation regarding the claimant's mental impairments, a psychological evaluation with Ms. Spaulding. Further, the undersigned notes Ms. Spaulding's [sic] based the diagnosis on the self-reported complaints proffered by the claimant. In fact, she failed to observe any deficiencies in persistence, concentration, or memory, or administer any psychological testing to support her opinions.

In sum, the above residual functional capacity assessment is supported by Dr. Osborne and Dr. Pascasio's opinions, as well as the record as a whole.

25

(Tr. at 12-21.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2011). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able

to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2011).  Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."  Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2011).  The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2011).  Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational.  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  Id. §§ 404.1527(d)(2), 416.927(d)(2).

Contrary to Claimant's assertions, the ALJ did not fail to comply with 20 C.F.R. §§ 404.1527 and 416.927.  As previously mentioned, a treating physician's opinion is given controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial

evidence.  In the subject claim, the ALJ acknowledged Dr. Morales as the treating physician and discussed at great length Dr. Morales' treatment records and opinions, including her August 10, 2010 and September 10, 2010 assessments for WVDHHR.  (Tr. at 12-21.)  The ALJ specifically stated that the assessments were not supported by clinical and laboratory techniques and were inconsistent with other substantial evidence, i.e. "no evidence to support limitations with regard to sitting or due to mental impairments."  (Tr. at 20.)

The ALJ properly weighed the opinion of Dr. Morales against the record as a whole when determining eligibility for benefits as required by 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2011).  The ALJ gave good reasons in his decision for the weight he gave Dr. Morales' opinion.  Id.  The ALJ noted that Dr. Morales stated that medications were effective, when properly taken, in controlling the symptoms related to Claimant's depression; Claimant never required treatment with a psychiatrist or psychologist; the consultative examination report of Psychologist Spaulding was essentially normal aside from Claimant's subjective complaints; Claimant's daily activities and clinical findings did not show a severe mental impairment; Claimant was not taking medications as prescribed by Dr. Morales, properly checking his blood sugar levels, or watching his diet; Dr. Bicak, a podiatrist, upon referral by Dr. Morales, observed Claimant ambulated at a normal angle and base of gait and was in no apparent distress; Dr. Bicak's tests showed Claimant's deep tendon reflexes, muscle strength testing, and muscle tones were normal;  Dr. Bicak found that inspections of the bones, joints, and muscles revealed no crepitation, pain or weakness; and the ALJ noted that Dr. Morales found Claimant had neuropathy of the feet bilaterally but that the record failed to document any evidence of upper extremity neuropathy.  (Tr. at 12-21.)

Thus, the undersigned proposes that the presiding District Judge **FIND** that the ALJ complied with 20 C.F.R. §§ 404.1527 and 416.927 in assessing the medical opinion evidence and that contrary to Claimant's assertions, the decision properly acknowledged Dr. Morales' as the treating physician and contained good reasons for rejecting the opinions expressed by Dr. Morales in the one-page forms submitted to WVDHHR dated August 10, 2010 and September 10, 2010.

<u>Residual Functional Capacity [RFC]</u>

Claimant argues the ALJ did not properly assess the residual functional capacity [RFC], "thus rendering vocational expert [VE] testimony irrelevant and unreliable." (Pl.'s Br. at 4.)  More specifically, Claimant asserts:

> Here, the ALJ has given a hypothetical RFC that is unclear and incomplete. He stated that the claimant can perform sedentary work "except the claimant is an individual with neuropathy."  *See* ALJDEC at 8.  However, the ALJ does not clarify what functional limitations the neuropathy would cause, but simply mentions that the individual suffers from it.  The VE cannot properly make a determination as to what limitations an individual would have with a diagnosis of neuropathy.  That is reserved to the ALJ and/or a medical expert.  Moreover, the record mentions neuropathy in both the claimant's upper and lower extremities, but the RFC does not clarify which extremities are affected by the neuropathy.  Additionally, the RFC includes that "the claimant has problems with eyesight."  *See* ALJDEC at 8.  However, the ALJ does not clarify what functional limitations are caused by the claimant's 'problems with eyesight.'  Again, it is impossible for the vocational expert to give reliable testimony if the hypothetical posed by the ALJ is improper.

(Pl.'s Br. at 5.)

The Commissioner responds that the VE testified that other work existed for an individual with Claimant's limitations.   (Def.'s Br. at 18.)   More specifically, the Commissioner asserts:

> Plaintiff complains that the ALJ's hypothetical question to the VE did not clarify limitations from neuropathy (Pl. Br. at 5).  However, the ALJ

specifically asked the VE to identify jobs that involved standing and walking for only 2 hours in an 8-hour day (limited to 30 minutes at a time), lifting 20 pounds occasionally and 10 pounds frequently, working in limited environments, and working with limited eyesight (Tr. 47-48). The vocational expert identified sedentary, unskilled work that Plaintiff could perform with those limitations (Tr. 47-48). As discussed previously, Plaintiff failed to prove that his neuropathy prevented him from performing the jobs the vocational expert identified.

Plaintiff further complains about the ALJ's finding that he had limited eyesight (Pl.'s Br. at 5). The ALJ, however, asked the vocational expert to identify jobs that someone could perform with eyesight problems (Tr. 47-48). Plaintiff has failed to establish how his eyesight would prevent him from performing the jobs the vocational expert identified. And there is no evidence that Plaintiff could not perform these jobs. In fact, Plaintiff did not get an annual diabetic eye examination as instructed (Tr. 269, 271-72, 277-78, 340-41). Although he wore glasses (Tr. 277), he never complained of eye problems or vision loss to his physicians (Tr. 298-303, 323-41, 344-45, 387). Physical examinations of his eyes were normal and showed that his pupils were equal, round, and reactive to light with intact extraocular movements (Tr. 267, 277-78, 367, 388, 413). Tellingly, in his application for benefits, he did not allege having any problems with seeing (Tr. 181, 194). Accordingly, Plaintiff failed to prove that his eyesight prevented him from performing the jobs the vocational expert identified.

(Def.'s Br. at 18-19.)

At the January 3, 2011 hearing, the ALJ posed this hypothetical question to the VE:

Q       All right. I'd ask you then to hypothetically consider a person as in the present case who is a younger person at all relevant times with education, training and work experience. I find that he suffers from diabetes mellitus with blood sugars that generally run a bit high. He suffers from hypertension - - [INAUDIBLE] - - and neuropathy in both the upper and lower extremities. Now, the state agency has concluded that the claimant can stand and walk for two hours out of an eight-hour day. But with regard to standing and walking, according to Exhibit Number 9F, Dr. Morales, standing and walking would be limited to 30 minutes at a time. There'd be some restrictions for working around extremely - extreme heat, extreme cold, around vibration, around machinery, heights, hazards and so forth. He could probably lift 20 pounds occasionally, 10 pounds frequently. The claimant has noted problems with his eyesight. If those were his residual, would there be any work such an individual could perform on a sustained basis.

A        Your honor, based on that hypothetical, I believe there would be occupations the individual could perform. At the sedentary level, we'd be looking at occupations such as - - excuse me - - inspector. Nationally we'd be looking at - - oh, I'm sorry - - DOT code 669.687-014 - - 80,000 jobs nationally and approximately 2,500 jobs regionally. There would also be assembler - - 739.687; 120,000 jobs nationally and about 4,000 jobs regionally. And there would also be - - [INAUDIBLE] - - clerk position - -

ATTY: What was that?

VE        - - DOT code 209.587-010; nationally, approximately 55,000 jobs and regionally approximately 2,000 jobs. These are all unskilled and sedentary. Region is West Virginia, Ohio, Kentucky and Virginia.

Q        Are your answers in every way consistent with the Dictionary of Occupational Titles?

A        Yes, sir.

(Tr. at 47-48.)

Regarding Claimant's RFC, the ALJ reached this conclusion:

After careful consideration of the entire record, the undersigned finds that the claimant has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except the claimant is an individual who suffers from neuropathy. In addition, the claimant can walk or stand two hours in and [sic, an] eight-hour day, but would be limited to standing or walking only thirty minutes at a time. The claimant should avoid exposure to extreme cold and heat, vibrations, and hazards such as machinery or heights. In addition, can occasionally lift twenty pounds and frequently lift ten pounds. Further, the claimant has problems with eyesight.

(Tr. at 17.)

The ALJ also made these findings regarding Claimant's RFC and the VE's testimony:

If the claimant had the RFC to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.28. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, the ALJ asked the VE whether jobs exist in the national economy for an individual with the claimant's age,

31

education, work experience, and RFC.  The VE testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as inspector…as an assembler…and as a office clerk…

Pursuant to SSR 00-4p, the VE's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the VE, the undersigned concludes that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. at 22.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity.  "RFC represents the most that an individual can do despite his or her limitations or restrictions."  See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996).  Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job.  20 C.F.R. §§ 404.1545(a) and 416.945(a) (2011).  "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)."  Id.  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments."  Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.  See 20 C.F.R. §§

404.1527(e)(2), 416.927(e)(2) (2011).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities -- presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

Contrary to Claimant's assertions, the ALJ did clarify with the VE what functional limitations the neuropathy would cause and did not "simply mention" that Claimant suffers from neuropathy. The ALJ asked the VE to identify jobs that involved standing and walking for only two hours in an eight-hour day, limited to thirty minutes at a time, environmental restrictions, lifting twenty pounds occasionally and ten pounds frequently, and taking into

consideration that Claimant had "noted problems with his eyesight." (Tr. at 47-48.)

The VE identified jobs that someone could perform with these limitations. (Tr. at 17, 47-48.) The ALJ made a clear determination that the record demonstrated that Claimant suffered only neuropathy of the lower extremities: "The undersigned notes although the claimant complained of neuropathy in the hands and arms, the record failed to document any evidence of upper extremity neuropathy." (Tr. at 19-20.) On July 11, 2009, evaluator Cindy Osbourne, D.O., stated that Claimant's primary diagnosis is "DM [Diabetes Mellitus] with LE [Lower Extremity] neuropathy" and his secondary diagnosis is "morbid obesity." (Tr. at 230.) On November 17, 2009, evaluator Porfirio Pascasio, M.D. stated that Claimant's primary diagnosis is "DM with LE neuropathy" and his secondary diagnosis is "morbid obesity." (Tr. at 314.) Neither evaluator found that Claimant suffered from upper extremity neuropathy or vision problems. It is noted that Claimant did not establish how his eyesight would prevent him from doing the jobs the VE identified nor did he complain of any vision problems to his physicians or list vision problems on his application for benefits. (Tr. at 181, 194.)

Thus, the undersigned proposes that the presiding District Judge **FIND** that the ALJ properly assessed Claimant's RFC and posed a valid hypothetical to the VE.

It is further proposed that the presiding District Judge **FIND** that the Commissioner's decision denying benefits is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby

**FILED**, and a copy will be submitted to the Honorable John T. Copenhaver. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

 December 18, 2012 
     Date

                                        Mary E. Stanley
                                        Mary E. Stanley
                                        United States Magistrate Judge